# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

|  |  |
|---|---|
| **Brighton Trustees, LLC**, on behalf of and as trustee for Cook Street Master Trust, Cook Street Master Trust III, and Diamond LS Trust; **Cook Street Trust IV**; **PHT Holding I, LP**; **Wilmington Trust, National Association**, not in its individual capacity, but solely as securities intermediary for Cook Street Master Trust III; **Wells Fargo Bank, National Association**, not in its individual capacity, but solely as securities intermediary for Cook Street Master Trust III and Cook Street Trust IV; and **Bank of Utah**, not in its individual capacity, but solely as securities intermediary for Diamond LS Trust, Cook Street Master Trust, and Cook Street Master Trust III, <br><br> Plaintiffs, <br><br> v. <br><br> The Lincoln National Life Insurance Company, <br><br> Defendant. | Case No. 1:23-cv-00171 |

**COMPLAINT**

Plaintiffs Brighton Trustees, LLC, on behalf of and as trustee for Cook Street Master Trust, Cook Street Master Trust III, and Diamond LS Trust; Cook Street Trust IV; PHT Holding I, LP; Wilmington Trust, National Association ("Wilmington Trust"), not in its individual capacity, but solely as securities intermediary for Cook Street Master Trust III (in such capacity, the "Wilmington Trust Securities Intermediary"); Wells Fargo Bank, National Association ("Wells Fargo"), not in its individual capacity, but solely as securities intermediary for Cook Street Master Trust III and Cook Street Trust IV (in such capacity, the "Wells Fargo Securities Intermediary"); and Bank of Utah, not in its individual capacity, but solely as securities intermediary for Diamond LS Trust, Cook Street Master Trust, and Cook Street Trust IV (in such capacity, the "Bank of Utah Securities Intermediary") (collectively, "Plaintiffs"), by and through their attorneys, file this Complaint against Defendant Lincoln National Life Insurance Company ("Lincoln" or "Defendant"), and allege as follows:

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) and (3) because (a) there is complete diversity of citizenship—Defendant is a citizen of Indiana and none of the Plaintiffs are citizens of Indiana, and (b) the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.     This Court has personal jurisdiction over Lincoln because Lincoln is an Indiana corporation with its principal place of business in Fort Wayne, Indiana.  In addition, Plaintiffs' claims arose out of Lincoln's conduct in Indiana, including because, on information and belief, Lincoln partly developed and approved the cost of insurance (sometimes referred to herein as "COI") rate increase at issue and prepared some of the notice letters to policyholders informing them of the rate increase in Indiana.

3.     Venue is proper pursuant to 28 U.S.C. § 1391(a)(1) because Lincoln's principal place of business is in Fort Wayne, Indiana, in the Northern District of Indiana.

## NATURE OF THE ACTION

4.     Plaintiffs bring this action seeking compensatory and punitive damages, equitable relief, and attorneys' fees based on Lincoln's unlawful increasing of COI rates (the "COI Rate Increase") on certain of its in-force JPF Legend 300 universal life insurance policies (the "Policies").   The Policies were originally issued by Jefferson-Pilot Life Insurance Company ("Jefferson-Pilot"), which was later acquired by Lincoln.   By raising COI rates by as much as 115% or more, without a proper basis, Lincoln has breached the express and implied terms of the Policies.

5.     The Policies are universal life insurance policies.   Universal life insurance is a form of life insurance also known as "flexible premium" adjustable life insurance.   Universal life insurance consists of two distinct components: (1) the life insurance component, for which the insurance company charges a cost to cover the risk of the insured's death (the "cost of insurance" or "COI"); and (2) a savings component, where premiums paid in excess of the COI (and certain other policy charges) accumulate and earn interest at a rate that will not be lower than a minimum "guaranteed interest rate" (generally referred to in the life insurance industry as the "guaranteed minimum crediting rate" because the interest is "credited" to the policyholder's account).

6.     Universal life insurance is designed to give policyholders flexibility, particularly with respect to the payment of premiums.   This can be demonstrated by comparing universal life insurance to whole life insurance.   With whole life insurance, a policyholder pays fixed monthly premium payments for the life of a policy.   These fixed monthly premium payments include an amount associated with the cost of actual insurance (i.e., the cost for the insurance company to bear the risk of the insured's death) but also an additional amount intended to build up a "cash value" that earns interest over time.   In the insured's earlier years, the fixed monthly premium payments are typically far higher than the insured's actual risk of death, and most of the premiums are used to accumulate cash value that will be used to fund the death benefit in the later years of the insured's life, when the fixed monthly premiums are likely to be lower than the actual risk of death.   That is, the "cash value" build-up in the earlier years operates as a "reserve" to pay the

death benefit in the later years.

7.      Universal life insurance "unbundles" these two components of a whole life insurance policy and allows policyholders to choose whether to pay just enough premiums to cover the charges for the insurance company to bear the risk of death (i.e., the cost of insurance) or pay more (subject to certain limitations) and build up a cash value that earns tax-deferred interest (which, among other things, comprises part of the death benefit and can be used to fund the policy charges in the future).

8.      Although there is no fixed monthly premium payment that is due, if the balance in the policy account is insufficient to cover the policy's monthly charges, which includes the cost of the insurance and certain other policy charges, the policy will enter a grace period and lapse unless additional premiums are paid.

9.      Universal life insurance policies have both guaranteed and non-guaranteed elements.  Guaranteed elements are fixed and determined at a specific time, such as when the policy was issued.  Non-guaranteed elements, on the other hand, are not fixed at a specific time and can be adjusted by the life insurance company under the terms of the policy.  An example of a guaranteed element is the guaranteed minimum interest (or crediting) rate.  An example of a non-guaranteed element is the COI rate.

10.     Although the Policies permit Lincoln to adjust COI rates (by increasing or decreasing them), the Policies restrict Lincoln's ability to do so in at least two important ways.  First, Lincoln may only change COI rates based on "future mortality, interest, expenses, and lapses."  Second, any change in COI rates must be "on a uniform basis for Insureds of the same rate class."

11.     The most important assumption in life insurance is mortality, and it is well-known in the life insurance industry that since Jefferson-Pilot began issuing the Policies in approximately 1999, mortality has **_improved_**, not **_worsened_**.  Indeed, in 2015, just one year before Lincoln began raising COI rates, the National Center for Health Statistics reported that mortality had improved

by 16.6% between 2000 and 2014.[1]  This improvement in mortality has resulted in new life insurance mortality tables that would, if anything, support a *decrease*, not *increase*, in COI rates. Despite this, Lincoln has increased the COI rates on the Policies, and it has done so by as much as 115% or more, in blatant breach of the Policies' express and implied terms and conditions.

12.     Lincoln also has attempted to justify the COI Rate Increase by claiming that low interest rates have resulted in lower-than-expected investment income to Lincoln.  But lower interest rates should not justify a rate increase as high as 115% or more.

13.     Furthermore, as noted above, the Policies state that any change in COI rates "will be on a uniform basis for Insureds of the same rate class."  But Lincoln admits that the COI Rate Increase does not apply on a uniform basis for insureds of the same rate class; it applies differently to insureds in the same rate class based at least on when their Policies were issued (i.e., based on duration).

14.     Moreover, by drastically raising COI rates by as much as 115% or more, it is apparent that Lincoln seeks to force Plaintiffs and other policyholders either to (a) pay exorbitant premiums that Lincoln knows would no longer justify the ultimate death benefits, or (b) lapse or surrender their Policies and forfeit the premiums they have paid to date, thereby depriving policyholders of the benefits of their Policies.  Lincoln, in turn, will make a huge profit—either through higher premium payments or by eliminating a large group of policies (through lapses or surrenders) and keeping the vast majority of the premiums that have been paid to date on them.

15.     Lincoln's misconduct, as described more fully herein, constitutes not only express breaches of the Policies, but also breaches of the implied covenant of good faith and fair dealing and conversion.  Plaintiffs therefore seek compensatory and punitive damages, as well as equitable relief and attorneys' fees.

16.     In apparent response to complaints about similar COI rate increases made by other universal life insurance companies over the last several years, NYDFS enacted a regulation that

---

[1] Sherry L. Murphy, et al., *Mortality in the United States*, 2014, NCHS Data Brief No. 229, 5 (Dec. 2015).

protects policyholders from unjustified life insurance premium increases. Among other things, NYDFS Insurance Regulation 210 ("Reg 210") mandates the examination, as needed, of "anticipated experience factors at specified times and under specified conditions but no less frequently than required by law to determine if the factors are reasonable." Reg 210 §§ 48.2(a)(1), 48.2(f)(2). The regulation defines experience factors as "investment income, mortality, morbidity, persistency, or expense that represents the insurer's financial experience on a class of policy" and emphasizes "[p]rofit margin is not an experience factor." Reg 210 § 48.1(h).

17.    In announcing the proposed regulation in a press release dated November 17, 2016, NYDFS's then-Superintendent Maria Vullo declared that New York "will not stand by and provide life insurers free reign to implement unjustified cost of insurance increases on New Yorkers simply to boost profits."[2]

18.    An article in The Wall Street Journal published the same day notes that the New York regulation "could be widely copied by other [states'] insurance departments."[3] A little more than a year later, California enacted a law similar to the New York regulation aimed at protecting policyholders from unjustified cost of insurance increases.[4] The law took effect on April 1, 2019. Cal. Ins. Code § 10113.7. Texas, too, has taken action. On June 14, 2019, Texas enacted its own law seeking to protect policyholders from unlawful cost of insurance rate increases.[5] The law, which the Texas House of Representatives and Senate both unanimously passed, took effect on

---

[2] See Press Release, NYDFS, *DFS Proposes New Regulation to Protect New Yorkers from Unjustified Life Insurance Premium Increases* (Nov. 17, 2016), https://www.dfs.ny.gov/reports_and_publications/press_releases/pr1611171 (last accessed Apr. 3, 2023).

[3] Leslie Scism, *New York Regulator Aims to Require Life Insurers Justify Higher Rates on Old Policies*, Wall St. J. (Nov. 17, 2016), http://www.wsj.com/articles/new-york-regulator-aims-to-require-life-insurers-justify-higher-rates-on-old-policies-1479394201 (last accessed Apr. 3, 2023).

[4] Press Release, Cal. Dep't of Ins., *Commissioner-Sponsored Life Insurance Bill Signed by Governor to Protect California Consumers* (Sept. 19, 2018), http://www.insurance.ca.gov/0400-news/0100-press-releases/2018/release115-2018.cfm (last accessed Apr. 3, 2023).

[5] HB 207, Texas Legislature Online: History, https://capitol.texas.gov/BillLookup/History.aspx?LegSess=86R&Bill=HB207 (last accessed Apr. 3, 2023).

September 1, 2019.  Tex. Ins. Code Ann. § 1101.204.

19.    Regulators have not only taken aim at the insurance companies for improperly attempting to increase cost of insurance rates, they have also condemned those companies for failing to adequately disclose to policyholders the risk of future cost of insurance rate increases. In the words of former acting NYDFS Superintendent, Linda Lacewell, "DFS takes consumer protection very seriously and will take all actions necessary to ensure that policyholders are not being misled by insurers and agents offering often complex products."[6]

### THE PARTIES

20.    Brighton Trustees, LLC, which brings this action on behalf of and as trustee for Cook Street Master Trust, Cook Street Master Trust III, and Diamond LS Trust, is a Delaware limited liability company with its principal place of business in New York.  The sole members of Brighton Trustees, LLC are individuals who are United States citizens domiciled in New York and Canada.

21.    Cook Street Master Trust, Cook Street Master Trust III, and Diamond LS Trust are New York common law trusts.  Cook Street Master Trust, Cook Street Master Trust III, and Diamond LS Trust are the beneficial owners and entitlement holders of certain of the Policies.  The trustee to Cook Street Master Trust, Cook Street Master Trust III, and Diamond LS Trust is Brighton Trustees, LLC.  The depositors of Cook Street Master Trust are BroadRiver II (Ireland) DAC and Drake Street Trust, a New York common law trust whose trustee is Brighton Trustees, LLC and whose depositor is BroadRiver II (Ireland) DAC.  BroadRiver II (Ireland) DAC is a juridical person.  The depositor of Cook Street Master Trust III is BroadRiver III (Ireland) DAC. BroadRiver III (Ireland) DAC is a juridical person.  The depositors of Diamond LS Trust are BroadRiver II (Ireland) DAC and Cook Street Master Trust.

22.    Cook Street Trust IV is a Delaware statutory trust and is the beneficial owner and entitlement holder of certain of the Policies.  The Delaware trustee of Cook Street Trust IV is

---

[6] Press Release, NYDFS, *Acting DFS Superintendent Lacewell Issues Consumer Alert Regarding Universal Life Insurance Policies* (Feb. 21, 2019), https://www.dfs.ny.gov/reports_and_publications/press_releases/pr1902211.

Wilmington Trust.  The depositor of Cook Street Trust IV is BroadRiver IV (Ireland) DAC. BroadRiver IV (Ireland) DAC is a juridical person.

23.    PHT Holding I, LP is a Delaware limited partnership and is the beneficial owner and entitlement holder of certain of the Policies.  The general partner of PHT Holding I, LP is BRRL 2022 GP, Ltd., a Cayman Islands exempted company.  The limited partner of PHT Holding I, LP is Red Lion Square Holdings LP, a Delaware limited partnership, whose partners are Cook Street Trust IV and BroadRiver IV (Ireland) DAC, which is a juridical person.  The sole beneficiary of Cook Street Trust IV is BroadRiver IV (Ireland) DAC.

24.    Bank of Utah is a Utah corporation with its principal place of business in Ogden, Utah.  Bank of Utah Securities Intermediary is appearing as a Plaintiff, not in its individual capacity, but solely in its ministerial capacity as securities intermediary for Diamond LS Trust, Cook Street Master Trust, and Cook Street Master Trust III.  Bank of Utah Securities Intermediary maintains a securities account for Diamond LS Trust as securities intermediary pursuant to an October 31, 2016 Custodial and Securities Account Control Agreement ("Bank of Utah Diamond CSACA") between Brighton Trustees, LLC, on behalf of and as trustee for Diamond LS Trust, and Bank of Utah Securities Intermediary.  Under the Bank of Utah Diamond CSACA, each Policy subject to the Bank of Utah Diamond CSACA constitutes a "Subject Life Contingent Asset" that the Bank of Utah Securities Intermediary has credited to the "Client Securities Account" maintained in accordance with the Bank of Utah Diamond CSACA.  Diamond LS Trust is the "beneficial owner" and "entitlement holder" under the Bank of Utah Diamond CSACA, and, accordingly, is entitled to exercise the rights that comprise each financial asset credited to the Client Securities Account created by the Bank of Utah Diamond CSACA.  Bank of Utah Securities Intermediary, as securities intermediary for Diamond LS Trust, is identified as the owner and beneficiary of certain policies on Lincoln's records.[7]

---

[7] As a securities intermediary, Bank of Utah Securities Intermediary is acting solely in its ministerial capacity as "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity."  U.C.C. § 8-102(a)(14)(ii).

25.     Bank of Utah Securities Intermediary maintains a securities account for Cook Street Master Trust as securities intermediary pursuant to a January 1, 2015 Custodial and Trust Account Control Agreement ("Bank of Utah Cook Street Master Trust CTACA") between Brighton Trustees, LLC, on behalf of and as trustee for Cook Street Master Trust, and Bank of Utah Securities Intermediary.  Under the Bank of Utah Cook Street Master Trust CTACA, each Policy subject to the Bank of Utah Cook Street Master Trust CTACA constitutes a "Subject Life Contingent Asset" that the Bank of Utah Securities Intermediary has credited to the "Client Securities Account" maintained in accordance with the Bank of Utah Cook Street Master Trust CTACA.  Cook Street Master Trust is the "beneficial owner" and "entitlement holder" under the Bank of Utah Cook Street Master Trust CTACA, and, accordingly, is entitled to exercise the rights that comprise each financial asset credited to the Client Securities Account created by the Bank of Utah Cook Street Master Trust CTACA.  Bank of Utah Securities Intermediary, as securities intermediary for Cook Street Master Trust, is identified as the owner and beneficiary of certain policies on Lincoln's records.[8]

26.     Bank of Utah Securities Intermediary maintains a securities account for Cook Street Master Trust III as securities intermediary pursuant to an April 8, 2018 Securities Account Control Agreement ("Bank of Utah Cook Street Master Trust III SACA") between Cook Street Master Trust III and Bank of Utah Securities Intermediary.  Under the Bank of Utah Cook Street Master Trust III SACA, each Policy subject to the Bank of Utah Cook Street Master Trust III SACA constitutes a "Financial Asset" that the Bank of Utah Securities Intermediary has credited to the "Securities Account" maintained in accordance with the Bank of Utah Cook Street Master Trust III SACA.  Cook Street Master Trust III is the "beneficial" and "entitlement holder" under the Bank of Utah Cook Street Master Trust III SACA, and, accordingly, is entitled to exercise the rights that comprise each financial asset credited to the Securities Account created by the Bank of

---

[8] As a securities intermediary, Bank of Utah Securities Intermediary is acting solely in its ministerial capacity as "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity."  U.C.C. § 8-102(a)(14)(ii).

Utah Cook Street Master Trust III SACA. Bank of Utah Securities Intermediary, as securities intermediary for Cook Street Master Trust III, is identified as the owner and beneficiary of certain policies on Lincoln's records.[9]

27.     Wilmington Trust is a national banking association organized under the laws of the United States with its main office in Wilmington, Delaware. Wilmington Trust Securities Intermediary is appearing as a Plaintiff not in its individual capacity, but solely in its ministerial capacity as securities intermediary for Cook Street Master Trust III. Wilmington Trust Securities Intermediary maintains securities accounts for Cook Street Master Trust III as securities intermediary pursuant to a December 4, 2017 Securities Account Control and Custodian Agreement ("Wilmington Trust SACCA") between Cook Street Master Trust III and Wilmington Trust Securities Intermediary. Under the Wilmington Trust SACCA, each Policy subject to the Wilmington Trust SACCA constitutes a "Financial Asset" that the Wilmington Trust Securities Intermediary has credited to the securities account maintained in accordance with the Wilmington Trust SACCA. Cook Street Master Trust III is the "beneficiary" and "Account Holder" under the Wilmington Trust SACCA, and, accordingly, is entitled to exercise the rights that comprise each financial asset credited to the securities account created by the Wilmington Trust SACCA. Wilmington Trust Securities Intermediary, as securities intermediary for Cook Street Master Trust III, is identified as the owner and beneficiary of certain policies on Lincoln's records.[10]

28.     Wells Fargo is a national banking association organized and existing under federal law, with its main office located in Sioux Falls, South Dakota, as identified in its Articles of Association. Wells Fargo Securities Intermediary is appearing as a Plaintiff, not in its individual

---

[9] As a securities intermediary, Bank of Utah Securities Intermediary is acting solely in its ministerial capacity as "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity." U.C.C. § 8-102(a)(14)(ii).

[10] As a securities intermediary, Wilmington Trust Securities Intermediary is acting solely in its ministerial capacity as "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity." U.C.C. § 8-102(a)(14)(ii).

capacity, but solely in its ministerial capacity as securities intermediary for Cook Street Master Trust III and Cook Street Trust IV.

29.     Wells Fargo Securities Intermediary maintains securities accounts for Cook Street Master Trust III as securities intermediary pursuant to an Amended and Restated Securities Account and Control and Custodian Agreement, dated as of July 20, 2022 (the "Wells Fargo Cook Street MT III SACCA"), between Cook Street Master Trust III, as purchaser, and Wells Fargo, as securities intermediary and custodian, which was implemented pursuant to an Omnibus Amendment Agreement, dated as of July 20, 2022 (the "Omnibus Amendment"), by and among Wells Fargo, Cook Street Master Trust III and Cook Street Trust IV.

30.     Wells Fargo Securities Intermediary maintains securities accounts for Cook Street Trust IV as securities intermediary pursuant to an Amended and Restated Securities Account and Control and Custodian Agreement, dated as of July 20, 2022 (together with the Wells Fargo Cook Street MT III SACCA, the "Wells Fargo SACCAs"), between Cook Street Trust IV, as purchaser, and Wells Fargo, as securities intermediary and custodian, which was implemented pursuant to the Omnibus Amendment .

31.     Under the Wells Fargo SACCAs, each Policy subject to the Wells Fargo SACCAs constitutes a "Financial Asset" that the Wells Fargo Securities Intermediary has credited to a securities account maintained in accordance with the Wells Fargo SACCAs.  Cook Street Master Trust III and Cook Street Trust IV are the "beneficiaries" and "entitlement holders" under the Wells Fargo SACCAs, and, accordingly, are entitled to exercise the rights that comprise each financial asset credited to the securities accounts created by the Wells Fargo SACCAs.  Wells Fargo Securities Intermediary, as securities intermediary for Cook Street Master Trust III and Cook Street Trust IV, is identified as the owner and beneficiary of certain policies on Lincoln's records.[11]

---

[11] As a securities intermediary, Wells Fargo Securities Intermediary is acting solely in its ministerial capacity as "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity."  U.C.C. § 8-102(a)(14)(ii).

32.    Lincoln is an Indiana corporation with its principal place of business in Fort Wayne, Indiana.

**FACTUAL BACKGROUND**

A.    **Plaintiffs Are Owners of Universal Life Insurance Policies Subject to Lincoln's COI Rate Increase**

33.    Cook Street Master Trust is the beneficial owner and entitlement holder of two Policies that Jefferson-Pilot issued in 2003 and 2005 (and that Lincoln later acquired) and that are subject to the COI Rate Increase (the "Cook Street Master Trust Policies"). Cook Street Master Trust is represented in this lawsuit by its trustee, Brighton Trustees, LLC. The Cook Street Master Trust Policies have face amounts of $4 million and $7.1 million, and are listed on the attached **Exhibit 1**. The Cook Street Master Trust Policies were issued and delivered in the States of Minnesota and California. A sample JPF Legend 300 Cook Street Master Trust Policy, redacted for privacy, is attached hereto as **Exhibit 2** (the "Cook Street Master Trust Doe Policy"). As noted above, Bank of Utah Securities Intermediary is listed on Lincoln's records as the owner and beneficiary of the Cook Street Master Trust Policies, but solely as securities intermediary for Cook Street Master Trust. Cook Street Master Trust, as the entitlement holder, owns the ultimate financial interest in the Cook Street Master Trust Policies. Cook Street Master Trust acquired the Cook Street Master Trust Policies and was granted all rights, title, and interest under each Cook Street Master Trust Policy, including all rights of recourse or recovery against Lincoln relating to its unlawful increasing of COI rates.

34.    Cook Street Master Trust III is the beneficial owner and entitlement holder of 21 Policies that Jefferson-Pilot issued between 2001 and 2005 (and that Lincoln later acquired) and that are subject to the COI Rate Increase (the "Cook Street Master Trust III Policies"). Cook Street Master Trust III is represented in this lawsuit by its trustee, Brighton Trustees, LLC. The Cook Street Master Trust III Policies range in face amount from $100,000 to $7.5 million and are listed on the attached **Exhibit 3**. The Cook Street Master Trust III Policies include Policies issued and delivered in the States of Alabama, California, Connecticut, Florida, Illinois, Maryland, Michigan,

North Carolina, Ohio, South Dakota, Utah, Washington, and West Virginia. A sample JPF Legend 300 Cook Street Master Trust III Policy, redacted for privacy, is attached hereto as **Exhibit 4** (the "Cook Street Master Trust III Doe Policy"). As noted above, Wilmington Trust Securities Intermediary, Wells Fargo Securities Intermediary, and Bank of Utah Securities Intermediary are listed on Lincoln's records as the owners and beneficiaries of the Cook Street Master Trust III Policies, but solely as securities intermediaries for Cook Street Master Trust III. Cook Street Master Trust III, as the entitlement holder, owns the ultimate financial interest in the Cook Street Master Trust III Policies. Cook Street Master Trust III acquired the Cook Street Master Trust III Policies and was granted all rights, title, and interest under each Cook Street Master Trust III Policy, including all rights of recourse or recovery against Lincoln relating to its unlawful increasing of COI rates.

35.    Cook Street Trust IV is the beneficial owner and entitlement holder of one Policy that Jefferson-Pilot issued in 2003 (and that Lincoln later acquired) and that is subject to the COI Rate Increase (the "Cook Street Trust IV Policy"). The Cook Street Trust IV Policy has a face amount of $100,000 and is listed on the attached **Exhibit 5**. The Cook Street Trust IV Policy was issued and delivered in the State of Ohio. The JPF Legend 300 Cook Street Trust IV Policy, redacted for privacy, is attached hereto as **Exhibit 6** (the "Cook Street Trust IV Doe Policy"). As noted above, Wells Fargo Securities Intermediary is listed on Lincoln's records as the owner and beneficiary of the Cook Street Trust IV Policy, but solely as securities intermediary for Cook Street Trust IV. Cook Street Trust IV, as the entitlement holder, owns the ultimate financial interest in the Cook Street Trust IV Policy. Cook Street Trust IV acquired the Cook Street Trust IV Policy and was granted all rights, title, and interest under the Cook Street Trust IV Policy, including all rights of recourse or recovery against Lincoln relating to its unlawful increasing of COI rates.

36.    Diamond LS Trust is the owner and beneficiary of one Policy that Jefferson-Pilot issued in 2005 (and Lincoln later acquired) and that is subject to the COI Rate Increase (the "Diamond LS Trust Policy"). Diamond LS Trust is represented in this lawsuit by its trustee, Brighton Trustees, LLC. The Diamond LS Trust Policy has a face amount of $5 million and is

listed on the attached **Exhibit 7**.  The Diamond LS Trust Policy was issued and delivered in the State of California.  The Diamond LS Trust Policy, redacted for privacy, is attached hereto as **Exhibit 8** (the "Diamond LS Trust Doe Policy").  As noted above, Bank of Utah Securities Intermediary is listed on Lincoln's records as the owner and beneficiary of the Diamond LS Trust Policy, but solely as securities intermediary for Diamond LS Trust.  Diamond LS Trust, as the entitlement holder, owns the ultimate financial interest in the Diamond LS Trust Policy.  Diamond LS Trust acquired the Diamond LS Trust Policy on October 21, 2016.  The purchase and sale agreement whereby Diamond LS Trust acquired the Diamond LS Trust Policy granted Diamond LS Trust all rights, title, and interest under the Diamond LS Trust Policy, including all rights of recourse or recovery against Lincoln relating to its unlawful increasing of COI rates.

37.      PHT Holding I, LP is the owner and beneficiary of two Policies that Jefferson-Pilot issued in 2005 (and Lincoln later acquired) and that are subject to the COI Rate Increase (the "PHT Holding I, LP Policies," and together with the Cook Street Master Trust Policies, the Cook Street Master Trust III Policies, the Cook Street Trust IV Policy, and the Diamond LS Trust Policy, the "Plaintiff Policies").  The PHT Holding I, LP Policies both have a face amount of $5 million and are listed on the attached **Exhibit 9**.  The PHT Holding I, LP Policies were issued and delivered in the States of Florida and South Dakota.  A sample JPF Legend 300 PHT Holding I, LP Policy, redacted for privacy, is attached hereto as **Exhibit 10** (the "PHT Holding I, LP Doe Policy," and together with the Cook Street Master Trust Doe Policy, the Cook Street Master Trust III Doe Policy, the Cook Street Trust IV Doe Policy, and Diamond LS Trust Doe Policy, the "Doe Policies").  PHT Holding I, LP is listed on Lincoln's records as the owner and beneficiary of the PHT Holding I, LP Policies.  PHT Holding I, LP acquired the PHT Holding I, LP Policies and was granted all rights, title, and interest under each PHT Holding I, LP Policy, including all rights of recourse or recovery against Lincoln relating to its unlawful increasing of COI rates.

38.      As is typical of universal life insurance policies, the Plaintiff Policies provide that they will remain in force as long as there are sufficient funds in the policy account each month to cover the monthly policy charges.  The monthly charges include a premium charge, an

administrative charge, and a COI charge, plus charges for any policy riders. Any balance in the policy account that is left after the deductions are taken reflects the "Policy Value," which accrues interest at a rate that cannot be lower than the "guaranteed interest rate." Cook Street Master Trust Doe Policy, Ex. 2, at 12; Cook Street Master Trust III Doe Policy, Ex. 4, at 12; Cook Street Trust IV Doe Policy, Ex. 6, at 11; Diamond LS Trust Doe Policy, Ex. 8, at 12; PHT Holding I, LP Doe Policy, Ex. 10, at 12. If in any month there are insufficient funds in the account to cover the monthly policy charges, the policy will enter a 60-day grace period. If additional premiums are not paid within the grace period, Lincoln will terminate, or lapse, the policy. Cook Street Master Trust Doe Policy, Ex. 2, at 11; Cook Street Master Trust III Doe Policy, Ex. 4, at 13; Cook Street Trust IV Doe Policy, Ex. 6, at 10; Diamond LS Trust Doe Policy, Ex. 8, at 11; PHT Holding I, LP Doe Policy, Ex. 10, at 11.

39.     The largest and most significant charge under the Plaintiff Policies is the COI charge. This charge, also known as the mortality charge, reflects the price that Lincoln charges to cover the risk of the insured's death. The COI charge is determined by multiplying the COI rate times the net amount at risk. The net amount at risk is the death benefit minus the Policy Value. The Policy Value, as described above, is deducted from the death benefit because, although the Policy Value is part of the death benefit paid upon the insured's death, policyholders do not pay COI on the Policy Value.

40.     The COI rates under a policy are based initially on certain characteristics of the insured, including her or his gender, age, and underwriting class (i.e., preferred plus, preferred, standard, and substandard classes). The COI rate increases every year as the insured ages.

41.     The "Cost of Insurance Rates" provision for JPF Legend 300 also states:

> The monthly cost of insurance rates are determined by [Lincoln]. Rates will be based on [Lincoln's] expectation of future mortality, interest, expenses, and lapses. Any change in the monthly cost of insurance rates used will be on a uniform basis for Insureds of the same rate class.

Cook Street Master Trust Doe Policy, Ex. 2, at 12; Cook Street Master Trust III Doe Policy, Ex. 4, at 12; Cook Street Trust IV Doe Policy, Ex. 6, at 11; Diamond LS Trust Doe Policy, Ex. 8, at

12; PHT Holding I, LP Doe Policy, Ex. 10, at 12.

42.    Accordingly, among many other things, under the terms of the Plaintiff Policies, any change in the COI rates (a) can only be based on "[Lincoln's] expectation of future mortality, interest, expenses, and lapses," and (b) must be "on a uniform basis for Insureds of the same rate class."

### B.    Lincoln Raises COI Rates

43.    In September 2016, Lincoln began notifying policyholders that it was raising the COI rates on certain of its inforce universal life insurance policies.  A sample notice letter is attached hereto as **Exhibit 11** (the "Notice Letter").  The Notice Letter states that "your policy's cost of insurance (COI) rates will increase."  Ex. 11.  Lincoln further states that an adjustment to the COI rates is necessary because "[w]e are operating in a challenging and changing environment as we continue to face nearly a decade of persistently low interest rates, including recent historic lows, and volatile financial markets."  *Id.*  As a result, Lincoln states that it is "making fair and reasonable adjustments as necessary and appropriate to ensure we are providing value to our customers while operating responsibly for the long-term."  *Id.*

44.    Lincoln does not state in the letter how much the COI Rate Increase will be, instead stating that the "amount of the COI rate change depends upon the product, underwriting class and duration."  *Id.* at FAQ No. 3.  The range of the COI Rate Increase has since been calculated to be approximately between 43% and 115% or more.

45.    With the Notice Letter, Lincoln attached a "Frequently Asked Questions" section ("FAQs").  In the FAQs, Lincoln responds to the frequently asked question about why COI rates are changing.  Lincoln's response states: "Cost of insurance (COI) rates are based on certain cost factors, including mortality, interest, expenses and lapses.  Our future expectations for these cost factors have changed; therefore policy COI rates have been adjusted to appropriately reflect those future expectations."  *Id.* at FAQ No. 1.

46.    Responding to a question whether COI rates were going up for all policies, Lincoln responded as follows: "All policyholders holding the impacted products will have some form of

COI adjustment.  While the majority of the rate changes are increases, some adjustments will be decreases, depending on future expectations of policy cost factors."  *Id.* at FAQ No. 2.

47.    In addition, in statements made to agents and brokers concerning the COI Rate Increase, which counsel for Plaintiffs found on the Internet, Lincoln states that the rate increase was based on "material changes in future expectations of key cost factors associated with providing this coverage, including: [l]ower investment income as a result of continued low interest rates[;] [u]pdated mortality assumptions, including instances of both higher and lower expected mortality rates versus prior expectations[; and] [u]pdated expenses, including higher reinsurance rates."[12]

48.    It is apparent that Lincoln's COI Rate Increase breaches the terms of the Plaintiff Policies in at least four ways.  ***First***, the COI Rate Increase is not "on a uniform basis for Insureds of the same rate class."  ***Second***, the COI Rate Increase is not based on "[Lincoln's] expectation of future mortality, interest, expenses, and lapses."  ***Third***, Plaintiffs are informed and believe, and on that basis allege, that the COI Rate Increase impermissibly attempts to circumvent the guaranteed interest rate under the Plaintiff Policies.  ***Fourth***, the COI Rate Increase breaches the implied covenant of good faith and fair dealing that exists in every insurance contract.

### C.    <u>The COI Rate Increase Is Not Uniform for All Policyholders in a Class</u>

49.    Lincoln's COI Rate Increase violates the provision that any rate increase be "on a uniform basis for Insureds of the same rate class" because the rate increase is not uniform for insureds of the same rate class.  Among other things, as Lincoln admits in the FAQ, the amount of the COI Rate Increase depends not just on the insured's rate class but also on "duration."  Ex. 11 at FAQ No. 3.  By basing the COI Rate Increase on more than just the insured's rate class, the COI Rate Increase is not "on a uniform basis for Insureds of the same rate class."

---

[12] Abbreviated Preview Edition of the Upcoming August 29, 2016, Lincoln Leader, Lincoln Financial Group, available at http://lincolnfinancial.dmplocal.com/dsc/collateral/LincolnLifeLeader-LGULCOI_-_No_watermark.pdf (last accessed Apr. 3, 2023) (discussion of the Policies at issue in this case on page 4).

**D.    The COI Rate Increase Is Not Based on Changes in Lincoln's Expectations as to Mortality and Interest or Any Other Enumerated Factor**

50.    The Plaintiff Policies state that Lincoln may base a change in COI rates only on "[Lincoln's] expectation of future mortality, interest, expenses, and lapses."  These are the only factors that Lincoln may consider.  Furthermore, to be in good faith and based on "future" expectations, the change in the COI rates must correspond with the magnitude of the changes in Lincoln's future expectations.

51.    Based on Lincoln's various statements about its rate increase, it appears that Lincoln has purportedly raised COI rates due primarily to purported changes in its expectations as to mortality and interest.

**Mortality**

52.    ***First***, as to mortality, it is well known in the life insurance industry that over the past decade, mortality has improved, not worsened, and people are living much longer than anticipated when Jefferson-Pilot originally priced the Plaintiff Policies in or around 1999.  For example, in 2015, just one year before Lincoln's rate increase, the National Center for Health Statistics reported "[s]ignificant decreases in mortality in 2014 compared with 2013" and observed that this year-to-year improvement was "consistent with long-term trends."  "Although year-to-year changes are usually relatively small," explained the National Center for Health Statistics, "the age-adjusted death rate in the United States decreased 16.6% between 2000 (869.0) and 2014 (724.6)."  This "long-term trend" of improving mortality is also evidenced by the release of several new mortality tables over the past two decades that would, if anything, support a decrease in COI rates, not an increase as high as 115% or more.

**Interest**

53.    ***Second***, as to interest, according to Lincoln's statements to its brokers and agents, Lincoln has raised COI rates in part due to lower interest rates, which Lincoln claims have resulted in lower investment income to Lincoln.

54.    While "interest" is listed as a cost factor for the JPF Legend 300 policies upon

which Lincoln may base a change in COI rates, Plaintiffs are informed and believe, and on that basis allege, that Lincoln's COI Rate Increase is based on "a decade of persistently low interest rates, including recent historic lows, and volatile financial markets." The historic decline in interest rates, however, cannot be the basis for a change in COI rates because the Policies require that any change in COI rates be based on Lincoln's expectations for the future. It cannot raise COI rates to recover past losses or shortfalls resulting from historic low interest rates.

55.     Moreover, even if lower interest rates may impact Lincoln's cost of providing insurance, they would not justify a COI rate increase as high as 115% or more because interest rates should be a relatively minor factor in calculating Lincoln's COI (and, consequently, its COI rates).

56.     To begin with, as it relates to COI rates, "interest" (one of the cost factors Lincoln may consider) can only refer to the interest that Lincoln earns (or expects to earn) on its profits from providing insurance, and not on funds in policyholders' accounts. This is because the COI is the mortality charge. It is intended to cover the risk of the insured's death, not the interest rate risk associated with policyholder accounts (and guaranteeing policyholders a minimum interest rate on their policy accounts).

57.     The COI charge includes an expected profit over the insurance company's expected mortality. The insurance company then expects to invest this profit and earn interest on it. The company then factors this profit and the interest on this profit in setting the COI rates. Lower interest rates may result in lower investment income, but lower interest rates would not result in a loss unless the insurance company's investments had a negative return. But this is highly unlikely to occur because most life insurance companies invest primarily in fixed-income securities, such as bonds. Thus, to the extent Lincoln is raising COI rates because it is earning less investment income on its mortality profits as a result of low interest rates, it is highly unlikely that this lower investment income would justify a rate increase, much less one as high as 115% or more.

58.     To illustrate this, assume Lincoln's COI rate contemplated a 20% mortality profit. For every $120 in COI charges received in a year, Lincoln would expect to pay out $100 in claims,

leaving $20 in mortality profits to invest.  If it assumed it would earn 5% on the profit of $20 in that year, it would expect to earn $1.00 of investment income.  If it now expects to earn 1% interest instead of 5%, the investment income would drop to $0.20 instead of $1.00.  But this 80% drop in investment income would not translate to an 80% COI rate increase because it does not capture the $20 mortality profit.  In other words, Lincoln is earning $20.20 instead of $21.00 on the mortality component, which is a difference of less than 4%, assuming mortality is as expected.  If Lincoln experienced favorable mortality, that favorable mortality experience should also offset the cost associated with the lower-than-expected investment income.  Although this is a rudimentary example, it illustrates how a decline in interest rates is not likely to result in a COI rate increase as high as 115% or more.

59.    As to the interest earned on the Policy Value of a universal life insurance policy, a life insurance company expects to earn a spread on the funds that policyholders maintain in their policy accounts.  That is, if the life insurance company is earning 8% interest on policyholder accounts, it may credit policyholders 7% and earn a spread of 1%.  If interest rates are low and the company is earning only 5% interest, it may lower the crediting rate to 4% and still earn a 1% spread.  Thus, even if Lincoln could consider the interest it earns from investing funds in policyholders' accounts (which it cannot), this would not justify a COI rate increase, but only a change in the interest rate credited to policyholders' accounts.

60.    However, if Lincoln expects to earn only 3% interest from investing funds in policyholders' accounts, Lincoln cannot reduce the crediting rate to 2% because this would be below the guaranteed minimum interest rate credited to policyholders.  Nor, however, can Lincoln attempt to offset this loss by raising COI rates.  If it could, the COI would not be a mortality charge, but a way for Lincoln to guarantee its profitability on the policies by transferring to policyholders all risk under the policies, including the interest rate risk on Policy Values.  This would render the guaranteed minimum interest rate meaningless.

61.    Furthermore, even if Lincoln is properly considering only interest on its mortality profits, to the extent Lincoln is raising COI rates to achieve its original profit expectations, the rate

increase is improper because Lincoln cannot raise rates simply to guarantee itself its original profit expectations.  As NYDFS has said, life insurance companies do not have free reign to raise COI rates "simply to boost profits" because profit margin is not an experience factor.

62.     In light of this, and given the magnitude of Lincoln's rate increase, Plaintiffs are informed and believe, and on that basis allege, that Lincoln has raised COI rates, not because its mortality and interest experience has been unfavorable enough to require an increase in COI rates, but solely to boost its profits.  Profit is not a factor that Lincoln can consider in changing COI rates.  Furthermore, using COI rates to guarantee Lincoln's original profitability expectations, and thereby placing its interest in maximizing gains over the rights of policyholders, would constitute a breach of the implied covenant of good faith and fair dealing.

63.     In sum, by drastically raising COI rates on the Plaintiff Policies, Lincoln seeks to force Plaintiffs to (a) pay exorbitant premiums that Lincoln knows would no longer justify the ultimate death benefits, or (b) lapse or surrender their Policies, thereby forfeiting the premiums they have paid over the last several years.  Lincoln, in turn, will make a huge profit—either through higher premium payments or by eliminating a large group of policies (through lapses or surrenders) and keeping the premiums that have been paid to date.

**E.      The COI Rate Increase Is an Impermissible Attempt to Circumvent the Guaranteed Minimum Interest Rate**

64.     Under the express terms of the Plaintiff Policies, a policyholder has the right to pay just enough premiums to cover the monthly policy charges.  If the policyholder contributes more than needed to cover the monthly charges, leaving a balance remaining in the policy account, the Plaintiff Policies provide that the balance will accrue interest at a rate no lower than the "guaranteed interest rate."  *See* Cook Street Master Trust Doe Policy, Ex. 2, at 12; Cook Street Master Trust III Doe Policy, Ex. 4, at 12; Cook Street Trust IV Doe Policy, Ex. 6, at 11; Diamond LS Trust Doe Policy, Ex. 8, at 12; PHT Holding I, LP Doe Policy, Ex. 10, at 12.  The guaranteed interest rate provided for under the Plaintiff Policies is 3% or 4%.

65.     Lincoln suggested that low interest rates, which may have reduced Lincoln's

investment income, were at least one reason for the COI Rate Increase. To the extent Lincoln considered the interest it earns on funds in policyholder accounts, the COI Rate Increase also violates the Plaintiff Policies' guaranteed minimum interest rate provision. This is evident because if Lincoln's investment income did not drop near or below the guaranteed interest rate, Lincoln could simply address the change in interest rates by lowering the interest rate credited to policyholders. But if Lincoln is raising COI rates instead of lowering the interest rate credited to policyholders, this presumably is because lowering the interest rate credited to policyholders would not be sufficient for Lincoln—because it is earning interest near or below the guaranteed interest rate (thus, reducing its originally anticipated spread). By raising COI rates to account for this, however, Lincoln is trying to do indirectly what it cannot do directly: it is using COI rates to achieve an interest rate credited to policy accounts that is lower than the guaranteed minimum interest rate, which violates the Plaintiff Policies.

66.     In short, Lincoln is trying to take the "guarantee" out of the guaranteed interest rate. By depriving policyholders of the right to the guaranteed interest rate, Lincoln has breached not just the express terms of the Plaintiff Policies, but also the implied covenant of good faith and fair dealing.

## COUNT I

### (Breach of Contract – Express)

### (All Policies)

67.     Plaintiffs reallege the allegations contained in paragraphs 1 through 66 inclusive, as if set forth fully herein.

68.     The Plaintiff Policies are binding and enforceable contracts.

69.     Lincoln materially breached the Plaintiff Policies in several respects, including, but not limited to, the following:

a.     By increasing COI rates on a basis that is not uniform for insureds of the same rate class;

     b.     By increasing COI rates on a basis other than Lincoln's "expectation of future mortality, interest, expenses, and lapses";

     c.     By increasing COI rates in an attempt to circumvent the guaranteed minimum interest rate; and

     d.     By imposing excessive COI rates, including by failing to lower cost of insurance rates.

70.     Plaintiffs have performed all of their obligations under the Plaintiff Policies, except to the extent that their obligations have been excused by Lincoln's conduct as alleged herein.

71.     As a direct and proximate cause of Lincoln's material breaches of the Plaintiff Policies, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.

## <u>COUNT II</u>

### (Implied Covenant of Good Faith and Fair Dealing – Contractual Breach)

### (All Policies)

72.     Plaintiffs reallege the allegations contained in paragraphs 1 through 66, inclusive, as if set forth fully herein.

73.     The Plaintiff Policies are binding and enforceable contracts.

74.     The Plaintiff Policies include an implied covenant, actionable in contract, that Lincoln will act in good faith and deal fairly with Plaintiffs.

75.     Lincoln materially breached the Plaintiff Policies in several respects, including, but not limited to, the following:

     a.     By charging excessive COI rates, thereby denying Plaintiffs the benefit of their actual Policy Values;

     b.     By failing to lower cost of insurance rates;

     c.     By considering interest that it earns on policyholder accounts, as opposed to interest only from its mortality profits, in raising COI rates;

> d.      By increasing COI rates in an attempt to achieve Lincoln's original expected profitability for the Plaintiff Policies at the policyholders' expense;

> e.      By increasing the COI rates to circumvent the guaranteed minimum interest rate under the Plaintiff Policies;

> f.      By attempting to force Plaintiffs either to (a) pay exorbitant premiums that Lincoln knows would no longer justify the ultimate death benefits, or (b) lapse or surrender their policies, thereby forfeiting the premiums they have paid to date; and

> g.      By failing to provide meaningful disclosures about the COI Rate Increase.

76.     Plaintiffs have performed all of their obligations under the Plaintiff Policies, except to the extent that their obligations have been excused by Lincoln's conduct as alleged herein.

77.     Lincoln's breaches were conscious, deliberate, and unreasonable acts, which were designed to and which did unfairly frustrate the agreed common purposes of the Plaintiff Policies and which disappointed Brighton Trustees', Cook Street Trust IV's, and PHT Holding I's reasonable expectations by denying Plaintiffs the benefits of the Plaintiff Policies.

78.     As a direct and proximate cause of Lincoln's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.

## <u>COUNT III</u>

**(Implied Covenant of Good Faith and Fair Dealing – Tortious Breach)**

**(Policies Issued in California)**

79.     Plaintiffs reallege the allegations contained in paragraphs 1 through 66, inclusive, as if set forth fully herein.

80.     The Plaintiff Policies are binding and enforceable contracts.

81.     The Plaintiff Policies include an implied covenant, actionable in tort, that Lincoln will act in good faith and deal fairly with Plaintiffs.

82.     Lincoln materially breached the Plaintiff Policies in several respects, including, but not limited to, the following:

      a.     By charging excessive COI rates, thereby denying Plaintiffs the benefit of their actual Policy Values;

      b.     By considering interest that it earns on policyholder accounts, as opposed to interest only from its mortality profits, in raising COI rates;

      c.     By increasing COI rates in an attempt to achieve Lincoln's original expected profitability for the Plaintiff Policies at the policyholders' expense;

      d.     By increasing the COI rates to circumvent the guaranteed minimum interest rate under the Plaintiff Policies;

      e.     By attempting to force Plaintiffs either to (a) pay exorbitant premiums that Lincoln knows would no longer justify the ultimate death benefits, or (b) lapse or surrender their policies, thereby forfeiting the premiums they have paid to date; and

      f.     By failing to provide meaningful disclosures about the COI Rate Increase.

83.     Plaintiffs have performed all of their obligations under the Plaintiff Policies, except to the extent that their obligations have been excused by Lincoln's conduct as alleged herein.

84.     Lincoln's breaches were conscious and deliberate acts, which were designed to and which did unfairly frustrate the agreed common purposes of the Plaintiff Policies and which disappointed Brighton Trustees', Cook Street Trust IV's, and PHT Holding I's reasonable expectations and disregarded Plaintiffs' rights by denying Plaintiffs the benefits of the Plaintiff Policies.

85.     As a direct and proximate cause of Lincoln's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.  Furthermore, Lincoln's conduct was conscious and deliberate, and constitutes oppression, fraud, or malice, justifying an award of punitive damages.

## COUNT IV

**(Conversion)**

**(All Policies)**

86.     Plaintiffs reallege the allegations contained in paragraphs 1 through 66, inclusive, as if set forth fully herein.

87.     Plaintiffs had a property interest in the funds Lincoln deducted from their Policy Values in excess of the amounts permitted by the terms of the Plaintiff Policies due to Lincoln's unlawful increasing of COI rates.

88.     Plaintiffs had the right to immediately possess the funds from their Policy Values.

89.     Lincoln intentionally and substantially interfered with that property interest.  By increasing of COI rates and making monthly deductions in unauthorized amounts from the Policy Values of Plaintiffs' Policies, Lincoln assumed and exercised ownership over, and misappropriated or misapplied, specific funds placed in the custody of Lincoln for the benefit of Plaintiffs, without authorization or consent and in hostility to the rights of Plaintiffs.

90.     Lincoln continues to retain these funds unlawfully.  At no time did Plaintiffs consent to such wrongful deduction and retention of funds by Lincoln.

91.     Lincoln's wrongful exercise of control over the personal property of Plaintiffs constitutes conversion.

92.     Lincoln intended to cause damage to Plaintiffs by its unlawful increasing of COI rates and deducting more from Plaintiffs' Policy Values than was authorized by the Plaintiff Policies.

93.     As a direct and proximate result of Lincoln's conduct, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.   Furthermore, Lincoln's conduct was conscious and deliberate, and constitutes oppression, fraud, or malice, justifying an award of punitive damages.

## COUNT V

### (Declaratory Relief)

### (All Policies)

94.     Plaintiffs reallege the allegations contained in paragraphs 1 through 66, inclusive, as if set forth fully herein.

95.     For reasons including, but not limited to, those stated herein, there exists an actual dispute and controversy between Plaintiffs and Lincoln concerning Plaintiffs' rights and Lincoln's obligations under the Plaintiff Policies, including but not limited to how Lincoln must implement any change in the COI rates and under what circumstances Lincoln may change the COI rates.

96.     Accordingly, Plaintiffs seek a declaration (a) that Lincoln's COI Rate Increase is improper under the Plaintiff Policies and that the Policies' account values be recalculated according to the original COI rates, and (b) setting forth the specific guidelines that govern the factual circumstances under which Lincoln can raise the COI rates.

97.     Such a declaration will help prevent or limit any future controversies under the Plaintiff Policies by providing guidance as to when and how Lincoln can change the COI rates on its in-force policies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

### On the First Cause of Action

1.     For compensatory damages in an amount to be determined at trial;

2.     For an award of pre-judgment and post-judgment interest;

3.     For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4.     For such other and further relief as the Court may deem proper.

### On the Second Cause of Action

1.     For compensatory damages in an amount to be determined at trial;

2.     For an award of pre-judgment and post-judgment interest;

3.      For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4.      For such other and further relief as the Court may deem proper.

**On the Third Cause of Action**

1.      For compensatory damages in an amount to be determined at trial;

2.      For punitive damages in an amount to be determined at trial;

3.      For an award of pre-judgment and post-judgment interest;

4.      For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

5.      For such other and further relief as the Court may deem proper.

**On the Fourth Cause of Action**

1.      For compensatory damages in an amount to be determined at trial;

2.      For punitive damages in an amount to be determined at trial;

3.      For an award of pre-judgment and post-judgment interest;

4.      For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

5.      For such other and further relief as the Court may deem proper.

**On the Fifth Cause of Action**

1.      For a declaration (a) that Lincoln's COI Rate Increase is improper under the Plaintiff Policies and that the Policies' account values be recalculated according to the original COI rates, and (b) setting forth the specific guidelines that govern the factual circumstances under which Lincoln can raise the COI rates;

2.      For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

3.      For such other and further relief as the Court may deem proper.

Dated: April 20, 2023

/s/ *John C. Trimble*
John C. Trimble, #1791-49
Aaron D. Grant, #25594-49
Charles R. Whybrew, #21148-49
LEWIS WAGNER, LLP
1411 Roosevelt Avenue, Suite 102
Indianapolis, IN 46201
Phone: 317-237-0500
Fax: 3176-630-2790
jtrimble@lewiswagner.com
agrant@lewiswagner.com
cwhybrew@lewiswagner.com

Khai LeQuang (*pro hac vice* admission pending)
Richard W. Krebs (*pro hac vice* admission pending)
ORRICK HERRINGTON & SUTCLIFFE LLP
2050 Main St., Suite 1100
Irvine, CA 92614
Phone: 949-567-6700
klequang@orrick.com
rkrebs@orrick.com

*Attorneys for Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure.


Dated:  April 20, 2023                    */s/ John C. Trimble*
                                          John C. Trimble, #1791-49
                                          Aaron D. Grant, #25594-49
                                          Charles R. Whybrew, #21148-49
                                          LEWIS WAGNER, LLP
                                          1411 Roosevelt Avenue, Suite 102
                                          Indianapolis, IN 46201
                                          Phone: 317-237-0500
                                          Fax:  3176-630-2790
                                          jtrimble@lewiswagner.com
                                          agrant@lewiswagner.com
                                          cwhybrew@lewiswagner.com

                                          Khai LeQuang (*pro hac vice* admission pending)
                                          Richard W. Krebs (*pro hac vice* admission pending)
                                          ORRICK HERRINGTON & SUTCLIFFE LLP
                                          2050 Main St., Suite 1100
                                          Irvine, CA 92614
                                          Phone: 949-567-6700
                                          klequang@orrick.com
                                          rkrebs@orrick.com


                                          *Attorneys for Plaintiffs*